IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LINH BAO, ) | |
| ) | 4:05cv3021 |
| Petitioner, ) | |
| ) | MEMORANDUM AND ORDER |
| vs. ) | |
| ) | |
| ROBERT HOUSTON, ) | |
| ) | |
| Respondent. ) | |

This matter is before the court for decision on the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("§ 2254 petition") filed by Linh Bao, a prisoner in the custody of the Nebraska Department of Correctional Services. The petitioner alleges violations of his constitutional rights in connection with his conviction and sentence in the District Court of Lancaster County, Nebraska, on or about October 20, 2000, for first degree murder and use of a deadly weapon to commit a felony. In his § 2254 petition, the petitioner asserted the following claims:

**Claim No. 1**.   The petitioner's trial attorney rendered ineffective assistance of counsel by failing to pursue a defense based on diminished mental capacity, by relying instead on a theory of self-defense, and by failing to obtain appropriate jury instructions regarding defense of others;

**Claim No. 2**.   The petitioner's trial attorney rendered ineffective assistance of counsel by failing to secure a jury instruction properly advising the jury to consider the defense of alcohol intoxication when deciding the issues of intent, premeditation and deliberation; and

**Claim Nos. 3-6**.   The petitioner suffered deprivations of his rights during his postconviction proceedings in the state district and appellate courts.

In Filing No. 22, this court ruled that the petitioner's Claim No. 2 has been procedurally defaulted, and that the procedural default is not excused. In addition, the petitioner has not established a miscarriage of justice such as actual innocence. Also in Filing No. 22, the court explained that Claim Nos. 3-6, all relating to errors and deprivations of rights on state postconviction review, are not cognizable in a federal habeas corpus proceeding. The parties have now submitted briefs on the issues defined in the petitioner's remaining Claim No. 1.

## Issues Before This Court

The Nebraska Supreme Court has twice considered the petitioner's case on the merits of his state and federal claims. See State v. Bao, 640 N.W.2d 405 (Neb. 2002) (affirming the petitioner's conviction on direct appeal) and State v. Bao, 690 N.W.2d 618 (Neb. 2005) (affirming the denial of postconviction relief). When the state appellate courts have adjudicated a petitioner's federal claims on the merits, this court applies a deferential standard of review under 28 U.S.C. § 2254(d).[1] As to the applicable law, this court considers whether the Nebraska appellate court(s), in adjudicating the merits of the petitioner's federal claims, produced a decision that was contrary to, or involved an

---

[1]28 U.S.C. § 2254(d) states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.[2] As to the facts, this court considers whether the adjudication by the Nebraska appellate court(s) was based on an unreasonable factual determination in light of the record.[3]

## State Court Decision to be Reviewed

Mr. Bao raised and exhausted the issues presented in his § 2254 Claim No. 1 during his state postconviction proceedings. The district court denied relief, and the Nebraska Supreme Court affirmed the denial of postconviction relief in State v. Bao, 690 N.W.2d 618 (Neb. 2005). In that opinion, the court incorporated the facts earlier recited in its decision on the petitioner's direct appeal. See State v. Bao, 690 N.W.2d at 622 ("The facts

---

[2]Within the meaning of 28 U.S.C. § 2254(d)(1), "[a] state-court decision is contrary to [the Supreme Court's] clearly established precedents if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005). Similarly, "[a] state-court decision involves an unreasonable application of ... clearly established precedents if the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner." Id.

[3]28 U.S.C. § 2254(d)(2) must be read together with 28 U.S.C. § 2254(e)(1), which states:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

As explained by the U.S. Supreme Court, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 324 (2003).

3

of the underlying case were described in our decision in Bao's direct appeal."). Thus, the background facts detailed in State v. Bao, 640 N.W.2d at 409-11 (decision on direct appeal), are set forth below:

> The victim, Vu Hoang La (Vu La) was shot while sitting in the driver's seat of a red car.
>
> [O]n February 5, 2000, Bao attended a party. According to Bao, he became involved in an altercation and the host and hostess of the party drove him home in their sports utility vehicle (SUV). Three men who were also at the party followed them in a red car.
>
> According to a statement Bao gave to the police, at least two of the men in the car following him, Vu La and Quynh Le, had tried to make trouble at the party When Bao arrived home, he was "scared to death." He went inside, retrieved an unloaded gun, and went back outside. The record shows that a struggle occurred between Bao, Vu La, and possibly Quynh Le. During this confrontation, Bao was accused of trying to scare them with a fake gun. Bao told the police that both Vu La and Quynh Le beat him up and that he was very frightened. He told the police that he got up, ran into his home, loaded the gun, and went back outside. Bao stated that when he came out again, Vu La was in the driver's seat of the red car and Quynh Le was standing "at the car," with the car door closed. Bao told the police that Quynh Le began walking toward him, that Bao shot the gun "into the sky," and that Quynh Le ran away. At times during the interview, Bao stated that Quynh Le tried to grab him or the gun. At other times, however, he stated that Quynh Le was farther away from him and did not touch him. Regardless, he maintained that he fired the gun in the air to scare Quynh Le away.
>
> Bao told police that he knew he fired one shot and maybe two, but did not remember firing any additional shots. He stated that he did not know if he shot Vu La or not, but that a couple of minutes after he fired the shots, he saw that Vu La was "sit[ting] still." When asked if he had pointed the gun at Vu La, Bao stated, "I think so. I don't know." Later, however, Bao insisted that he did not remember shooting at the car and that he shot the gun toward the sky.
>
> Hanh Nguyen, who, with her husband, Dang Nguyen, had driven Bao home, testified that she saw Vu La wrestle Bao to the ground and that she saw Bao holding a black object. She testified that she told Vu La and Quynh Le to go home. She saw Vu La walk around the red car, but did not see him get inside. She testified that Quynh Le had already started walking

4

home, that she drove her SUV over by him and told him to get in, and that she then heard two gunshots. Quynh Le also testified that he had started to walk home and that as he was walking, he heard gunshots. Quynh Le's testimony indicated that he did not get into either the Nguyens' SUV or the red car. The record indicates that Dang Nguyen was outside the SUV when Vu La wrestled Bao to the ground, but that Dang Nguyen then got back in the SUV and did not get out again.

Bao's wife testified that on February 5, 2000, Bao arrived home and was mumbling to himself, "Do you want to kill me?" She testified that Bao took something from the closet where his gun was kept and went back outside. She followed him outside, carrying their baby. Bao's wife testified that she saw two people hit Bao and try to take a gun from him. At some point, she took the gun from Bao. She testified that Bao took a few steps backward, then took the gun away from her and ran back inside their residence. She stated that one of the men tried to follow Bao, but the other man stated that they should go home. She told the men that the gun was real and that they should go home. She then went back inside. She testified that inside the residence, Bao looked angry and was walking back and forth asking, "Where is my bullet?" She saw him "do something" to the gun and then go back outside. She then heard two or three gunshots. She testified that Bao then returned to the residence and said, "I shot him. I shot him," and, apparently referring to Vu La, yelled, "Do you want to kill me? I already shot you."

Bao's neighbor, John M. Brooks, Jr., testified that on February 5, 2000, he heard noises outside his residence and looked out his window to see what was happening. Brooks testified that he saw Bao and a man fighting over something and another man possibly trying to break up the fight. Brooks saw the fight break up and saw one of the men hand something to a woman with a baby. He then saw Bao stand, back up, and then run forward again and take the object. He testified that Bao then ran toward his residence with the object. He testified that the people outside then attempted to get Vu La back into his car while Vu La kept yelling toward Bao's residence. Brooks stated that Vu La and a person he described as "the younger Asian male" got into Vu La's car and that a woman and a man got into the SUV. The SUV drove to the north, turned around, and then proceeded south down the street.

Brooks testified that he saw the red car pull onto the street and stop. He then saw the backup lights come on, and he thought the red car was going to turn around and follow the SUV. Brooks testified that at that time, he heard a gunshot. He stated that he saw Bao running toward the car, firing the gun. According to Brooks, Bao was holding the gun straight out in front of him when he was shooting. Brooks heard a total of three or four

5

gunshots. He testified that the first shot appeared to shatter the passenger-side window and that the other shots were going into the car. Brooks called the 911 emergency dispatch service, and the police and emergency personnel arrived and found Vu La dead in the driver's seat. Police officers found four shell casings in the vicinity of the car. A physician who performed an autopsy on Vu La determined that he had died as a result of a gunshot wound and that the manner of death was homicide.

**Applicable Federal Law**

In this case, Strickland v. Washington, 466 U.S. 668 (1984), is the controlling "clearly established Federal law" contemplated by 28 U.S.C. § 2254(d)(1). See, e.g., Honeycutt v. Roper, 426 F.3d 957, 960 (8th Cir. 2005) (Strickland is "the controlling authority for ineffective assistance of counsel claims"), cert. denied, 126 S.Ct. 2353 (2006). The Nebraska Supreme Court correctly recognized Strickland as controlling, see State v. Bao, 690 N.W.2d at 623 ("Standards of Review"). So the question is whether the decision in State v. Bao, 690 N.W.2d at 625-28, on the merits of the petitioner's ineffective assistance claim was either "contrary to" or "an unreasonable application" of Strickland.

As the Eighth Circuit Court of Appeals points out: "the Supreme Court has repeatedly stressed that an unreasonable application is different from an incorrect one .... We may not grant a writ of habeas corpus unless the relevant state court decision is both wrong and unreasonable." Id., 426 F.3d at 960 (citation and internal quotation marks omitted).

"Ineffective assistance under Strickland is deficient performance by counsel resulting in prejudice." Rompilla v. Beard, 545 U.S. 374, 380 (2005). "In order to overturn a conviction on grounds of ineffective assistance of counsel, the [petitioner] must show that his trial counsel's performance fell below the standard of customary skill and diligence that a reasonably competent attorney would display and that there is a reasonable probability

6

that the outcome would have been different but for the substandard actions of counsel." Rousan v. Roper, 436 F.3d 951, 959 (8th Cir.) (*citing* Strickland, 466 U.S. at 694), cert. denied, 127 S.Ct. 68 (2006). Thus, a habeas petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense.

To establish prejudice, a petitioner must affirmatively demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Id. If counsel's performance was not deficient or if the petitioner suffered no prejudice, the court need not address the other part of the test. Williams v. Locke, 403 F.3d 1022, 1025 (8th Cir. 2005) ("we need not ask whether [the] lawyer's performance was deficient if we can clearly determine that no prejudice resulted from [the] lawyer's alleged error").

## Defense of Others

Regarding defense of others, the court has previously determined that jury *instruction* issues in this case have been procedurally defaulted. The petitioner has not demonstrated a basis to excuse that procedural default.

As for any deficiency in counsel's failure to pursue a *theory* of "defense of others," the petitioner cannot demonstrate prejudice as a result of that failure. The trial court instructed the jury to consider, in sequence, the crimes of first degree murder, second degree murder and manslaughter. The jury found first degree murder, notwithstanding the petitioner's mitigating evidence that the shooting had been justified by self-defense.

Since 1977, the relevant Nebraska statutes have defined first degree and second degree murder and voluntary and involuntary manslaughter as follows:

> Neb. Rev. Stat. § 28-303(1) -- A person commits murder in the first degree if he or she kills another person (1) purposely and with deliberate and premeditated malice.
>
> Neb. Rev. Stat. § 28-304(1) – A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation.
>
> Neb. Rev. Stat. § 28-305(1) – A person commits manslaughter if he kills another without malice, either upon a sudden quarrel [voluntary manslaughter], or causes the death of another unintentionally while in the commission of an unlawful act [involuntary manslaughter].

<u>Mens Rea Elements</u>

The burden to prove the elements of an offense always rests with the prosecution and cannot be shifted to a defendant. However, the line of demarcation is not always clear. The burden to establish factual circumstances which admit an element (e.g. mens rea), but offer an excuse, or a mitigating or extenuating circumstance, may be allocated to a defendant. See, e.g., <u>Patterson v. New York</u>, 432 U.S. 197, 202 (1977) (state law may allocate to the defendant the burden of proving the mitigating circumstance of severe emotional disturbance, which, if proved, would reduce the offense of second-degree murder to manslaughter). See also <u>Martin v. Ohio</u>, 480 U.S. 228, 234 (1987) (holding that a state may require the defendant to bear the burden of proof on the issue of self-defense):

> We are thus not moved by assertions that the elements of aggravated murder and self-defense overlap in the sense that evidence to prove the latter will often tend to negate the former. It may be that most encounters in which self-defense is claimed arise suddenly and involve no prior plan or specific purpose to take life. In those cases, evidence offered to support the defense may negate a purposeful killing by prior calculation and design, but Ohio does not shift to the defendant the burden of disproving any element of the state's case. When the prosecution has made out a prima facie case

and survives a motion to acquit, the jury may nevertheless not convict if the evidence offered by the defendant raises any reasonable doubt about the existence of any fact necessary for the finding of guilt.

As the Nebraska Supreme Court explained on direct appeal when reviewing the sufficiency of the evidence in support of the jury verdict in this case, the critical facts involved the petitioner's retreat from the scene into the house twice, followed by a return to the scene with a loaded firearm, and the evidence that he fired directly at the victim, who at that time was seated in a car. To agree unanimously on a verdict of first degree murder, the jury must necessarily have found that the accused had formed the intent and deliberate, premeditated malice necessary for that offense. See State v. Bao, 640 N.W.2d at 417:

> There was evidence that Bao left the scene of the struggle with Vu La, returned to his residence to get ammunition for his gun, loaded the gun, and then returned outside, where he then fired shots. When Bao was in his residence, his wife noted that he looked angry and testified that he was walking back and forth asking, "Where is my bullet?" Although there was evidence that Bao was afraid of Vu La and Quynh Le and that Quynh Le may have been approaching Bao at the time the shots were fired, there was evidence to the contrary. Other evidence showed that when Bao returned outside, Vu La was in his red car and Quynh Le was either in a vehicle or walking away. Further, there was evidence that Bao did not shoot toward the sky as he stated, but that he shot directly at Vu La's car while running toward it. Under these circumstances, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Bao formed the intent to kill and deliberated on that idea before executing it....

In light of the jury's finding that the petitioner had formed the mens rea for first degree murder, and the jury's rejection of the petitioner's mitigating evidence of self-defense, there is no reason to believe that the jury would have subscribed to a similar mitigation theory of defense of others. The petitioner has not shown a reasonable probability that the jury would have abandoned its judgment that the petitioner had formed

the mens rea for first degree murder if trial counsel had emphasized defense of others instead of, or in addition to, the extenuating circumstance of self-defense.

## Diminished Mental Capacity Instead of Self-defense

The petitioner argues that his trial attorneys should have pursued the defense of diminished capacity instead of self-defense. He relies on Rompilla v. Beard, 545 U.S. 374 (2005), a death penalty decision in which the U.S. Supreme Court found that the failure of counsel for the petitioner to examine the case file for mitigating circumstances to present at sentencing constituted prejudicial ineffective assistance of counsel. Mr. Bao quotes from Rompilla, 545 U.S. at 393: "[A]lthough we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered 'mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of [Rompilla's] culpability,' ... and the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing...." (Citations to Strickland and other cases omitted.)

The petitioner also cites Seidel v. Merkle, 146 F.3d 750, 752 (9th Cir. 1998), which, while not a U.S. Supreme Court decision, is a good example of an attorney's abandonment of his client's mental health defense, constituting ineffective assistance of counsel. The petitioner's trial attorney in Seidel rendered a constitutionally deficient performance by ignoring multiple references in the pretrial record to the petitioner's history of psychiatric hospitalizations and medications. The attorney failed to follow up by investigation into any of those leads concerning the petitioner's mental status. The attorney in Seidel had actual notice that the petitioner suffered from a mental disorder, as evidenced by the attorney's

10

notes that his client had experienced blackouts, anger fits, and was about to be put on medication by prison mental health providers. The attorney also had constructive notice (as Seidel had been medicated by a prison psychiatrist and had been admitted to a variety of mental hospitals). Nevertheless, the attorney failed to inquire into and uncover his client's brain damage and post-traumatic stress disorder. Id. at 756. As the Sixth Circuit explained in Campbell v. Coyle, 260 F.3d 531 (6th Cir. 2001), discussing Seidel, 146 F.3d at 756:

> Despite this awareness that something was seriously wrong with his client's mental state, Seidel's counsel failed to review any of Seidel's medical records, declined to interview any witnesses about Seidel's medical condition, did not request a psychiatric evaluation of his client, and ignored various other aspects of his client's medical history .... Had he done any of those things, Seidel's attorney would not have missed his client's mitigating medical condition.

According to the petitioner, his trial attorneys ignored indications that the petitioner suffered from emotional instability, suicidal tendencies, depression, anxiety, feelings of hopelessness, and a history of alcohol abuse. If his trial attorney had ordered a mental health evaluation, the petitioner contends that his "alcohol-induced anxiety disorder" would have been revealed, and expert evidence of that disorder would have negated or refuted the mens rea elements of deliberate and premeditated malice.

At his postconviction hearing (PC BOE[4] at 24-34, 59), the petitioner testified that he had informed one of his trial attorneys about the history of mental illness in the petitioner's family, and he may have discussed his own history of suicide attempts, although he did not remember with certainty whether he did so. He testified that he did inform his attorneys

---

[4]Vol. I, Bill of Exceptions of 2002 postconviction proceedings in Case No. CR00-168, before the Hon. Steven D. Burns, Lancaster County District Judge.

11

before trial that he suffered from stress, anxiety and depression. According to the petitioner's postconviction testimony, he conveyed to both of his trial attorneys his desire to have a psychiatric evaluation before trial, but counsel ignored that request (id. at 35-36, 74-75).

At the petitioner's postconviction hearing, Dr. James K. Cole testified as an expert forensic psychologist, having evaluated the petitioner to determine whether the petitioner suffered from any mental health disorder on February 5, 2000 (id. at 86-167). In Dr. Cole's opinion, the petitioner did have an "alcohol-induced anxiety disorder" during the period including February 5, 2000 (id. at 104). As explained by Dr. Cole, when the petitioner was not consuming alcohol, he did not manifest significant evidence of anxiety or depression, but when drinking, the petitioner exhibited symptoms of depression, anger and anxiety, which included an exaggerated fright reaction to perceived threats (id. at 107-18). Thus, at the time of the shooting, the petitioner suffered from an alcohol-induced anxiety reaction which resulted in impulsive, violent behavior (id. at 117-18). The petitioner also had a predisposition to emotional instability and a borderline personality disorder involving unstable relationships, suicidal ideation, impulsive behavior and over-reaction (id. at 118-21). Those traits "increased the risk" of emotional breakdown, instability and violence (id. at 121-27).

On the other hand, according to Dr. Cole, the petitioner did not meet the criteria for insanity (id. at 131). The petitioner maintained an awareness or understanding of the nature and consequences of his behavior (id.), and Dr. Cole could not find that the petitioner lacked the ability to understand right and wrong or that the petitioner lacked the ability to conform his behavior accordingly, with respect to the petitioner's conduct on the

12

day of the shooting (id. at 131-32). Dr. Cole specifically did not find evidence that the petitioner's condition rendered him incapable of forming an intent to shoot Vu La (id. at 132-33, 161-62). "I don't have evidence that he [the petitioner] had a cognitive deficit that would significantly interfere with his ability to appraise what he was doing, add reason to it in a somewhat accurate manner." (Id. at 161.)

Dr. Cole's written psychological evaluation (Exhibit 212 at the postconviction hearing) reflected the same findings. The information available to Dr. Cole about the petitioner's interaction with the victim beginning at the party preceding the shooting suggested symptoms of an emotional disorder, anxiety or panic reaction, in which alcohol abuse may have contributed to an exaggerated sense of threat in the petitioner's mind. It was evident to Dr. Cole that the petitioner was extremely frightened by the time he reached his home and jumped from the car, and that the petitioner was an emotionally unstable individual prone to impulsive, self-destructive behaviors and subject to an alcohol-induced exacerbated perception of threat by two strangers. The petitioner's anxiety and anger against the perceived source of threat increased the risk of assaultive behavior.

Nevertheless, although the foregoing postconviction evidence by the petitioner and Dr. Cole helps to explain *why* the petitioner shot Vu La, the evidence does not negate, or even contradict, the mens rea elements of intent, premeditation and deliberation. For example, Neb. Rev. Stat. § 28-302(3) defines "premeditation" simply as "a design formed to do something before it is done." "[O]ne kills with 'premeditated malice' if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification .... **The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the**

13

**design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed**." State v. Harms, 643 N.W.2d 359, 380 (Neb. 2002) (emphasis added).

Not only may the mental elements of deliberation and premeditation be formed within an instant before the lethal act, Nebraska law does *not* require **rational** deliberation and premeditation. Id. at 380: "We find nothing in § 28-303 or in this court's interpretation of § 28-303 which requires that a defendant must rationally consider the probable consequences of his or her actions or rationally determine to kill the victim without legal justification .... Therefore, in stating its findings, the district court did not err in determining that 'rational' was not a required element of 'premeditation' or 'deliberation.'" Id.

Thus, the petitioner's emotional instability, feelings of dread, fear, hopelessness, anxiety and anger, exaggerated perception of threat, and distorted view of reality, all enhanced by alcohol consumption, nevertheless fell short of the defense of insanity, and did not provide the petitioner with a mental defense recognized by Nebraska law to the charge of first degree murder. Certainly, Dr. Cole's expert testimony and report at no point found the petitioner unable to form the intent, premeditation or deliberation necessary to commit first degree murder.[5]

The petitioner's senior trial counsel, Robert G. Hays, testified at the postconviction hearing, and co-counsel, Timothy Sopinski, testified by deposition, explaining their trial

---

[5]The petitioner insists that expert evidence of his mental condition would have been admissible at trial (Filing No. 25, Petitioner's Reply Brief, at 8-9). However, any dispute regarding admissibility of an expert psychological evaluation on the issue of mens rea is moot, because Dr. Cole could not find any evidence that the petitioner lacked the capability of forming the requisite mental state for murder (e.g., PC BOE at 131-33, 161-62).

14

strategies and underlying reasoning regarding the defense of Mr. Bao. From the beginning, they viewed the petitioner as a sympathetic defendant, particularly after talking with him about the circumstances of the shooting. They were particularly impressed by the petitioner's decision to call the police and turn himself in voluntarily. The victim, on the other hand, was a decidedly unsympathetic character, who had threatened the petitioner, picked on him, and followed the petitioner home. The petitioner had been frightened and outnumbered. Those facts impressed the attorneys as likely to appeal to a jury and to enable the jury to empathize with the petitioner (PC BOE at 175-79).

Although the legal theory of self-defense and the elements of manslaughter were weak, the petitioner's circumstances were sufficiently sympathetic that the attorneys hoped to undermine the elements of deliberate and premeditated malice in the jury's minds by raising the issue of self-defense (id. at 179-81, 191-95, 199). The strategy was to lead the jury away from first and second degree murder by emphasizing the petitioner's terror for his own safety, in light of the abuse the petitioner had suffered earlier in the day at the hands of two large and aggressive tormentors, including Vu La, who had followed the petitioner to his home and who appeared to be unwilling to leave (id. at 181-83, 192-95, 199).

Mr. Hays did not have the impression that insanity was a viable defense in this case (id. at 184, 201). Therefore, notwithstanding indications from the jail with custody of the petitioner that the petitioner might be suicidal, the attorneys did not consider a psychological evaluation helpful to the defense, absent insanity as a genuine issue. Nebraska law recognizes insanity as an affirmative defense, but in Nebraska, the only role for diminished capacity, or a similar mental condition less than insanity, is to attempt to

15

negate the mens rea element(s) of the offense such as intent (id. at 184-85). However, attempting to present expert evidence that the petitioner shot the victim in a diminished mental state would have created a risk of antagonizing the jury, as (id. at 185, 200) jurors do not like "mental experts to say that a person is not responsible for his behavior." Such a strategy would have undermined the goal of presenting the petitioner to the jury as a sympathetic individual (id. at 186). The ultimate goal, if unable to obtain an acquittal, was to encourage the jury to find sudden quarrel manslaughter (id. at 198-99).[6]

As for Dr. Cole's diagnoses of alcohol dependence, alcohol-induced anxiety disorder and borderline personality disorder, Mr. Hays could not have used that information at trial for any purpose, including to negate malice (id. at 204-05). Strategically, "a personality disorder" simply connotes "a bad person." (Id. at 205.) Similarly, a diagnosis of an "alcohol problem" suggests "he's a drunk but he wasn't so drunk that he didn't know what he was doing." (Id.) Even after the fact, Mr. Hays did not believe that he could have succeeded with an argument that the petitioner "has some kind of a mental defect that only becomes viable when he's drunk." (Id. at 206.) The attorneys chose to argue that the petitioner "did what he did because of his circumstances and not because he's a defective human being." (Id. at 207.)[7]

---

[6] As the respondent pointed out in the Brief of Appellee during the postconviction appeal (Case No. S-03-1333): "It would have been an odd defense strategy to have a mental health expert testify that Bao had mental disorders indicative of an inability to get along with others, anxiety when drunk, an addiction to continued drinking, and a propensity toward violence." (Exhibit 12, Appellee's Brief in the Postconviction Appeal at 23.) In the respondent's reasonable view, instead of helping the petitioner, expert evidence of that kind would, as likely as not, have motivated the jury to incarcerate the petitioner (id. at 24).

[7] The January 10, 2003 deposition testimony of Mr. Sopinski (Exhibit 216) is consistent with Mr. Hays' testimony.

In conclusion, it is important to emphasize that habeas corpus review does not permit retrial of a state-court criminal case by a federal district court. Under 28 U.S.C. § 2254(d) and (e)(1), this court may decide only if the Nebraska courts unreasonably or incorrectly applied U.S. Supreme Court precedent or unreasonably determined the facts in light of the record.

The petitioner has not established that the tactical decisions by his trial attorneys were unreasonable. In evaluating whether counsel's performance fell below an objective standard of reasonableness, this court may not engage in hindsight. See, e.g., Osborne v. Purkett, 411 F.3d 911, 918 (8th Cir. 2005) (In a habeas case, "[w]e do not 'second-guess strategic decisions or exploit the benefits of hindsight.'"), cert. denied, 126 S.Ct. 1569 (2006). (Citation omitted.) "[O]ur scrutiny of counsel's performance is 'highly deferential,' and we presume that counsel's conduct 'falls within the wide range of reasonable professional assistance.'" Id., *citing* Strickland, 466 U.S. at 689. "[W]e have frequently recognized that the strategic and tactical decisions made by counsel, though they may appear unwise in hindsight, cannot serve as the basis for an ineffective-assistance claim under Strickland." Evans v. Luebbers, 371 F.3d 438, 446 (8th Cir. 2004), cert. denied, 543 U.S. 1067 (2005).

Furthermore, Dr. Cole's testimony and report did not demonstrate a reasonable probability that, had such an evaluation been presented to the petitioner's jury, the result of the proceeding would have been different. Consequently, the petitioner has not established the element of prejudice, whether or not he has demonstrated deficient performance by his trial attorneys.

In <u>State v. Bao</u>, 690 N.W.2d at 625-27, the Nebraska Supreme Court applied the correct legal standards and found no factual or legal basis to support either deficient performance or prejudice with respect to the petitioner's claims of ineffective assistance of counsel.  Insofar as those claims are reasserted in the petitioner's § 2254 Claim No. 1, the Nebraska courts did not reach a decision which was contrary to, or an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court, and the Nebraska courts did not unreasonably determine the facts in light of the record.

THEREFORE, IT IS ORDERED:

1. That the Petition for Writ of Habeas Corpus filed by Linh Bao is denied and dismissed with prejudice; and

2. That judgment will be entered accordingly.

DATED this 16th day of April, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge